**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

v.

**LIBBEY, INC., et al., Defendants.**

**Civil Action No. 02–0060 (RBW).**

United States District Court,
District of Columbia.

May 20, 2002.

Rhett R. Krulla, Washington, DC, for Plaintiff.

Steven H. Schulman, E. Marcellus Williamson, Latham & Watkins, Washington, DC, Richard C. Weisberg, Merion, PA, William S. D'Amico Chadbourne & Parke, Washington, DC, for Defendants.

## AMENDED MEMORANDUM OPINION

WALTON, District Judge.

On June 17, 2001, Libbey, Inc., ("Libbey") and Newell Rubbermaid, Inc.,

("Newell") entered into a merger agreement whereby Libbey would acquire all of the stock of Newell's subsidiary, Anchor Hocking Corporation ("Anchor"). The Federal Trade Commission ("Commission" or "FTC") sought to enjoin this merger pursuant to section 13(b) of the Federal Trade Commission Act (FTCA), 15 U.S.C. § 45(b) (1995). Approximately one month after the Commission voted in favor of seeking the injunction, Libbey and Newell amended their agreement. Although the agreement as amended ostensibly addressed the FTC's concerns about the original agreement's potential anti-competitive effects, the FTC continues to seek a preliminary injunction based on its belief that the agreement, even as amended, may violate Section 7 of the Clayton Act, 15 U.S.C. § 18 (1995) or Section 5 of the FTCA, 15 U.S.C. § 45, by either substantially reducing competition in the relevant product market or by constituting an unfair method of competition.

The Court shares some of the FTC's concerns as to why the amended agreement may have an anti-competitive effect on the relevant product market and for the reasons stated below, the FTC's motion for a preliminary injunction is granted.

## I. BACKGROUND

Libbey is the largest manufacturer and seller of food service glassware in the United States.[1] ("Compl." ¶ 11.)[2] Libbey produces and sells both food service and retail glassware. (Plaintiff's Motion for Preliminary Injunction ("Pl.'s Mot.") at 2.) In particular, Libbey produces and sells soda-lime glassware.[3] (Id.) Libbey's glassware product line consists of various styles of tumblers, stemware and other products "ranging from serving platters to candle holders." (Compl. ¶ 11.) Libbey's food service customers include distributors who resell soda-lime glassware[4] to restaurants, hotels, and other food service establishments. (Compl. ¶ 11.)[5]

The food service glassware market in the United States is a "highly concentrat-

1. The food service industry includes restaurants, hotels, airline companies, other out-of-home food service providers and distributors who service the food service industry. Glass tableware is sold primarily into three channels of distribution: food service, retail and specialty/industrial. (Defendants' Amended Joint Proposed Findings of Fact and Conclusions of Law ("Defs.' Am. Proposed Findings") ¶¶ 19–20 at 8.)

2. Throughout this opinion "Compl." refers to the Plaintiff's Complaint for Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act and "Am. Compl." refers to the Plaintiff's Amended Complaint for Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act.

3. "Soda lime glass[ware] is a mixture ... of sand and soda ash, which is melted in a furnace at temperatures ranging from 24— [presumably the witness meant 2400] to 2800 degrees Fahrenheit." (Plaintiff's Exhibit ("Pl.'s Ex.") 629 Deposition of Mark Eichhorn dated September 20, 2001 at 18:11–17.) Soda lime glassware differs from "lead crystal" which is more expensive and fragile than glassware and is used primarily in fine dining establishments. (Pl.'s Mot. at 17.) Soda lime glassware also differs from plastic drinkware which scratches easily and progressively diminishes in clarity each time it is cleaned in a dishwasher. (Id. at 16.) Neither Anchor nor Libbey considers lead crystal or plastic pricing in determining the pricing of their soda-lime glassware. (Id. at 17.)

4. Throughout this opinion the terms "food service glassware" and "soda-lime glassware" are used interchangeably.

5. Aside from distributors, Libbey's other food service customers include restaurants (such as Outback Steakhouse), hotels (such as Marriott), and airline companies (such as United Airlines). (Defendants' Joint Proposed Findings of Fact and Conclusions of Law ("Defs.' Proposed Findings") ¶ 20 at 17.)

ed" market that generates sales of approximately $270 million a year. (Pl.'s Mot. at 1.) Libbey currently has a market share in excess of 65 percent[6] in the food service glassware market. (Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl.s' Proposed Findings") ¶210 at 66.) Aside from Libbey, there are three other domestic companies[7] that make "significant" food service glassware sales in the United States: Anchor, Arc International, and Oneida Limited.[8] (Id. at 3.) Anchor is Libbey's most formidable competitor in the food service glassware market. (Id.) Anchor has the third largest share of the market with an approximate seven percent.[9] (Id.) Both Libbey and Anchor produce and sell soda-lime glassware in the food service and the retail markets.[10] (Id. at 2.)

The food service glassware market differs significantly from the retail glassware market.[11] (Id.) While the majority of purchases in the retail glassware market in-

volve the sale of new products, as stores are constantly trying to change and improve their merchandise, nearly 80 percent of food service glassware purchases are for the replacement of glassware that has been stolen, broken, or otherwise rendered useless in order to maintain consistency with food service providers' existing stock. (Id.) Accordingly, because Libbey dominates the food service glassware market, most food service customers must acquire new glassware from Libbey or glassware that resembles Libbey's products. (Id.) Thus, to compete meaningfully in the food service glassware market, a competitor needs the dual capacity to produce "Libbey look-alike" products at the same or lower prices than Libbey. (Id. at 3.)

Anchor has been selling Libbey look-alike food service glassware for over 20 years and has been able to sell Libbey look-alikes at prices lower than Libbey. (Id.) Anchor was the first company to pro-

6. In its proposed findings, the FTC alternatively states that Libbey has "a market share of over 65 percent in the food service glassware market" (Pl.'s Proposed Findings ¶234 at 74) and that Libbey is the "market leader with an approximate 72 [percent] share of the food service glassware market[.]" (Pl.'s Proposed Findings ¶210 at 66.)

7. Defendants contend that competitors in the market "include both manufacturers and sellers with no manufacturing capacity." (Defendants' Amended Joint Proposed Findings of Fact and Conclusions of Law ("Defs.' Am. Proposed Findings") ¶25.) The competitors included under this definition, according to defendants, include both foreign and domestic companies, namely: "Libbey, Anchor Hocking, Oneida, Schott Zweisel, Pasabache, Bormioli Rocco, Kedaung, Lancaster Colony/Indiana Glass, World Kitchen, Krosno, Durobor N.V. Arc International and Cardinal." (Id.)

8. Defendants identify Cardinal International as a significant competitor in the food service glassware industry in the United States, how-

ever, Cardinal International only distributes glassware manufactured by Arc International under an exclusive distribution agreement. (Defs.' Am. Proposed Findings ¶27 at 10.)

9. The second largest share of the market belongs to Arc International, who has approximately a ten percent share of the market. (Pl.'s Proposed Findings ¶210 at 66.) Oneida has an approximate market share of three percent. (Id.)

10. The Commission does not contend that the proposed acquisition by Libbey of Anchor's retail glassware business would significantly reduce competition in the retail glassware market, which is dominated mainly by imported glassware suppliers. (Pl.'s Motion at 2, ftnt. 3.)

11. "Retail customers are stores that re-sell glass tableware to the ultimate consumer" and include department stores (such as J.C. Penney's), mass merchandisers (such as Kmart), speciality stores (such as Crate & Barrel) and warehouse clubs (such as Costco). (Defs.' Proposed Findings ¶21 at 17.)

duce such Libbey look-alike food service glassware and is currently the leading seller of Libbey look-alikes, with nearly 80 percent of its sales resulting from the sale of such glassware.[12] (*Id.*) Anchor's prices are frequently 10 to 20 percent lower than Libbey's prices. (Pl.'s Proposed Findings ¶ 243 at 77.) As a result, Anchor has been able to secure the business of prior Libbey customers and has plans to more aggressively target Libbey's customers in the future. (Pl.'s Mot. at 39 n. 71.)

Libbey, however, according to the FTC, has been able to maintain its dominant position in the food service glassware market by allegedly "tying up distributors, penalizing those distributors for carrying competing goods, and suing entrants." (*Id.* at 1.)[13] Libbey is currently the price leader in the food service glassware market and its glassware prices tend to be higher than it those for similar products offered by other suppliers. (Pl.'s Proposed Findings ¶ 94 at 245.) Libbey's prices are at least 10 percent higher in the food service market, where it dominates the market, than in the retail market, where it has a smaller market share. (*Id.* ¶ 295 at 96.) In addition, entry into the food service glassware market would be costly and difficult for a new company because it would require "large sunk investments in building distribution and inventory, and acquiring the molds needed to produce glassware that would substitute for Libbey's." (*Id.* at 3–4.) Thus, if Anchor is eliminated from the market, it "is unlikely to be replaced by the entry of new food service glassware suppliers." (*Id.* at 3.)

Pursuant to the Stock Purchase Agreement dated June 17, 2001, Libbey sought to acquire all of Anchor's assets from Newell, Anchor's parent corporation, for $332 million.[14] (Defendants' Amended Joint Proposed Findings of Fact and Conclusions of Law ("Defs.' Am. Proposed Findings") ¶ 29 at 11.) This initial acquisition agreement would have resulted in Libbey acquiring Anchor's food service, retail, and speciality/industrial[15] glassware businesses, including its two glassware manufacturing plants in Lancaster, Ohio and Monaca, Pennsylvania.[16] (*Id.*) The FTC

---

12. Like Anchor, Oneida also sells Libbey look-alikes, but on a smaller scale than Anchor. (Pl.'s Mot. at 3.)

13. For example, Libbey's "Primary Distributor Program" ("PDP") rewarded Libbey distributors who purchased glassware exclusively from Libbey and penalized distributors who purchased Libbey look-alikes from Anchor and Oneida. (Pl.'s Mot. at 38.) Until recently, PDP distributors who purchased Libbey look-alikes lost "50% of earned rebates." (*Id.*) Libbey has since abandoned its PDP. (*Id.*) Libbey's current rebate program, in part, "requires distributors to purchase at least 130 SKUs [Sales Keeping Units] of Libbey items in order to qualify for rebates." (*Id.* at 39.)

14. As required by the Hart–Scott–Rodino Improvements Act of 1976; 15 U.S.C. § 18 ("HSR Act"), Libbey and Newell filed a Premerger Notification and Report Form with the FTC on June 20, 2001, which advised the FTC

of Libbey's proposed acquisition of Anchor. (Reply Memorandum in Support of Plaintiff's Motion for Preliminary Injunction ("Pl.'s Reply") at 5.)

15. Industrial or speciality glassware sales are those made to original equipment manufacturers who use the glass product as components of their own products, such as candles, vases and light fixtures. (Defs.' Proposed Findings ¶ 22 at 18.)

16. Nine percent of the glassware produced in Anchor's factories is sold in the food service industry. In 2001, Anchor had domestic glassware sales of approximately $197 million, of which $17.6 million were food service glassware products. (Defendants' Joint Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction ("Defs.' Joint Opp'n") at 7.) However, Anchor also outsources, *i.e.*, obtains from other manufacturers, some of its glassware. (Defs.' Am. Pro-

alleged that the proposed acquisition would "reduc[e] the limited competition that exists today in th[e] highly concentrated [food service] market, which Libbey already dominates." (Pl.'s Mot. at 3.) As a result, on December 18, 2001, the Commissioners authorized the initiation of this action pursuant to Section 13(b) of the FTCA, 15 U.S.C. § 45, to obtain a preliminary injunction that would bar Libbey's acquisition of Anchor until the completion of the FTC's administrative process to determine whether the proposed acquisition violated Section 5 of the FTC Act, 15 U.S.C. § 45, or Section 7 of the Clayton Act, 15 U.S.C. § 18.

On January 21, 2002, in response to the FTC's concerns, and in an attempt to salvage the merger, defendants amended the proposed merger agreement. (Am. Compl.¶ 11.) The amended agreement eliminated the purchase of Anchor's food service business, which is worth an estimated $17.9 million, while still permitting Libbey to acquire Anchor's retail and specialty/ industrial business, worth an estimated $179.1 million, for a total cost of $277.5 million. (Defs.' Am. Proposed Findings ¶¶ 48–50 at 17–18.)

The defendants argue that the amended agreement should have alleviated the FTC's concerns about the potential anticompetitive effect the original agreement would have on the food service glassware market for several reasons. (Defendants' Joint Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction ("Defs.' Joint Opp'n") at 13.) First, under

the amended agreement, Newell would retain Anchor's food service business and Rubbermaid Commercial Products ("RCP"), a division of Newell with an "extensive food service distributor network" and a significant presence in the food service industry, would operate what is now Anchor's food service glassware business. (Defs.' Opp'n at 7.) Second, Newell argues that RCP will be as effective a competitor as Anchor has been in the food service glassware market because "RCP will have the [219] forming molds [which accounted for 93% of Anchor's food service revenues in 2001], the distribution network, the sales force, the marketing experience, a years worth of inventory and [the] backing of a $7 billion company necessary to compete in the sale of food service glassware." (Defs.' Am. Proposed Findings ¶ 58 at 21.) [17] Third, Libbey contends that Newell's representations to its customers and shareholders that it will continue Anchor's food service business, coupled with its financial investment in the food service market, demonstrate that Newell is committed to making RCP a strong competitor in the food service glassware market. (Defs.' Opp'n at 13.) Fourth, the American Flint Glass Workers Union, which represents Libbey's and Anchor's factory workers support the acquisition as a "major and necessary step to insure the very competitive nature of [the] domestic industry." (Defs.' Am. Proposed Findings ¶ 30 at 11; Defendants' Exhibit ("Defs.' Ex.") 36, Letter from Joe Coccho, President of the American Flint Glass Workers Union, AFL–CIO, dated December 11, 2001.) As

posed Findings ¶ 65 at 24.) Under the amended agreement, "RCP will outsource all of its glassware." (Id. ¶ 58 at 21.)

17. Many molds are used to make glassware products that are sold to both food service and retail customers. (Defs.' Am. Proposed Findings ¶ 62 at 22.) Under the amended agreement, Libbey would acquire molds that

are sold "primarily to retail customers, and in trivial amounts to food service customers." (Id. ¶ 64 at 23.) For example, Libbey will acquire the molds necessary to make "large glass storage jars," which accounted for approximately $1.1 million of Anchor's 2001 sales to food service customers but accounted for over $5.8 million of Anchor's 2001 sales to retail customers. (Id.)

a final reason for why the Court should permit the revised acquisition to proceed, Libbey points out that if the FTC's motion for a preliminary injunction is granted, the proposed acquisition will dissolve because the financing arrangement to fund the purchase of Anchor will be withdrawn by the banks who have agreed to fund this acquisition on April 30, 2002.[18] (Defs.' Opp'n at 8.)

On February 22, 2002, the FTC filed its Amended Complaint for Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act[19] alleging that the amended merger agreement did not materially change the original agreement or its likely detrimental effect on competition. In support of its argument, the FTC noted that the amended agreement merely reduced the consideration Libbey would pay to Newell and the assets Libbey would acquire from Newell by less than 10 percent. (Am.Compl.¶ 12–13.) In addition, under the terms of the amended agreement "Libbey still would acquire both of the manufacturing plants that Anchor uses to make food service glassware; the Anchor brand name; and certain other assets (including employees, molds, and customer relationships) used by Anchor in the food service business." (Am. Compl.¶ 12.)

The FTC views the amended agreement as a "sham" because, it contends, Newell does not actually intend to continue as a competitor in the food service glassware market. (Reply Memorandum in Support of Plaintiff's Motion for Preliminary Injunction ("Pl.'s Reply") at 2–3, 16.) As proof of this argument, the FTC points to the fact that Newell will be selling Anchor's two manufacturing facilities to Libbey and thus RCP will not be able to manufacture its own food service glassware. (Id. at 4.) Although Newell has stated that RCP will outsource for its food service glassware, i.e., purchase it from another manufacturer, the FTC questions whether the manufacturer identified by Newell, Peldar S.A. ("Peldar"), will be a reliable resource for the glassware because it is located in Colombia, a country that currently and has been experiencing for many years civil unrest and internal instability.[20] (Pl.'s Reply at 22.) The FTC

---

18. Libbey assured the FTC that it would not consummate the acquisition until the Court ruled on the FTC's motion for a preliminary injunction, except on 10–days prior notice to the FTC. (Pl.'s Mot. at 5.)

19. It was not clear from the amended complaint whether the FTC's staff attorneys had received authorization from the Commission to file it. As a result, the Court construed Section 13(b) of the FTCA, 15 U.S.C § 53(b), to require the Commission's authorization before its staff attorneys could file the amended complaint challenging the amended merger agreement. Consequently, on March 29, 2002, the Court issued an Order directing counsel for the FTC to advise the Court whether the Commission had authorized its staff attorneys to file the amended complaint. On April 2, 2002, the FTC submitted its response in which it informed the Court that it does not construe Section 13(b) of the FTCA, 15 U.S.C. § 53(b), to require the Commission

to formally authorize the filing of an amended complaint in "every case where merging parties amend a merger agreement that the Commission has found reason to believe violates the antitrust laws." (Plaintiffs Submission in Response to the Court's March 29, 2002 Order ("Pl.'s Submission") at 2.) Nevertheless, the Commission advised the Court that it had "reaffirm[ed]" its decision to challenge the proposed merger agreement, even as amended. (Pl.'s Submission at 3.) Accordingly, the Court now concludes that the amended complaint and agreement are properly before it.

20. The FTC contends that Newell's plan to outsource from Peldar (also known as Cristar) is problematic for several additional reasons, including import tariffs and other carrying costs that RCP would likely incure, which could make glassware obtained from Peldar as much as 42% higher than Anchor's current glassware acquisition supply costs. (Pl.'s Reply at 23.)

opines further that even if RCP can successfully outsource from Peldar, RCP's outsourcing costs will be 4.3 percent higher than Anchor's current manufacturing costs and RCP will have to pass this cost onto its customers, thus hindering its ability to compete with Libbey. (*Id.* at 22–23.) The FTC argues that this higher glassware acquisition cost may force RCP to either increase its prices or reduce the amount of glassware it can have available for distribution. (Plaintiff's Supplemental Proposed Findings of Fact and Conclusions of Law ("Pl.'s Supp. Findings") at ¶ 613 at 22.) The FTC further argues that if RCP does not earn enough profit to absorb its "substantial glassware cost increases" it might exit the market altogether. (*Id.* at ¶ 613 at 22.)

The FTC further argues that the amended agreement was reached "not for business reasons, but as the predicate for a defense to the merger presented to and challenged by the FTC." (Pl.'s Reply at 17.)[21] As evidence of this fact, the FTC points out that Newell has failed to present any evidence that it has a viable business plan that will address how it will be able to place a competitively priced product on the market with a higher cost to acquire its glassware, without passing this higher cost on to consumers. (Pl.'s Reply at 19–21.) In seeking to refute this argument, Libbey argues that since RCP will have a year's worth of inventory and will use the marketing, design and sales programs that have made Anchor an effective competitor in the food service glassware market, it will be able to remain at least as competitive as Anchor has been. (Defs.' Ex. 5, Affidavit of Michael Moorefield, President of Rubbermaid Commercial Products, ¶ 17.) For example, RCP will

utilize a rebate program that has several components, including volume-based discounts and allowances for promotions that apply to all of RCP's products, thus allowing it to continue to sell food service glassware at a competitive price. (*Id.* ¶ 17 n. 1.)

Finally, the FTC argues that if a preliminary injunction is not granted, Libbey's acquisition of Anchor would have the effect of "scrambl[ing] the eggs" by in effect transferring all of Anchor's confidential information, management personnel, books and assets to Libbey, which the FTC argues would prevent it from receiving meaningful relief if indeed it is determined that the transaction violates the antitrust laws. (Pl.'s Mot. at 5.)

## II. ANALYSIS

■■ Section 7 of the Clayton Act prohibits acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18. "Whenever the Commission has reason to believe that a corporation is violating, or is about to violate, Section 7 of the Clayton Act, the FTC may seek a preliminary injunction to prevent a merger pending the Commission's administrative adjudication of the merger's legality." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C.Cir.2001) (quoting *FTC v. Staples, Inc.*, 970 F.Supp. 1066, 1070 (D.D.C.1997)). This Court may issue a preliminary injunction "where such action would be in the public interest—as determined by a weighing of the equities and a consideration of the Commission's likelihood of success on the merits." *Id.* (citing 15

---

21. The defendants do not dispute that they restructured their agreement "[to] meet their original strategic business objectives while re-

solving the FTC's concerns." (Defs.' Joint Opp'n at 2.)

U.S.C. § 53(b)); *FTC v. Weyerhaeuser,* 665 F.2d 1072, 1080–81 (D.C.Cir.1981). This standard is broader than the traditional equity standard that is normally applicable to requests for injunctive relief and is consistent with Congress' intention "that injunctive relief be broadly available to the FTC." *Id.* Thus, under this analysis, the Court must determine (1) the Commission's likelihood of success on the merits in this matter and (2) whether a balancing of the equities weighs in favor of granting the relief the FTC seeks. *Heinz,* 246 F.3d at 714; *FTC v. Staples,* 970 F.Supp. 1066, 1071 (D.D.C.1997) (citations omitted).

### A. The FTC's Likelihood of Success on the Merits

In determining the FTC's likelihood of success on the merits, the Court must "measure the probability that, after an administrative hearing on the merits, the Commission will succeed in proving that the effect of the [Libbey/Anchor] merger *'may be substantially to lessen competition, or to tend to create a monopoly'* in violation of section 7 of the Clayton Act." *Heinz,* 246 F.3d at 713 (citing 15 U.S.C. § 18) (emphasis added). The Commission can satisfy this burden by "rais[ing] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals.'" *Id.* at 714–15 (citations omitted). Under this standard, the FTC does not have to prove to this Court that the proposed merger will in fact violate Section 7 of the Clayton Act because "[t]he Congress used the words *'may* be substantially to lessen com-

petition' ... to indicate that its concern was with probabilities, not certainties." *Id.*

Whether the FTC has sufficiently proven a Section 7 violation requires the following analytical approach:

First, the government must show that the merger would produce 'a firm controlling an undue percentage share of the relevant market, and [would] result[ ] in a significant increase in the concentration of firms in that market.' Such a showing establishes a 'presumption that the merger will substantially lessen competition. To rebut the presumption, the defendants must produce evidence that 'show[s] that the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition' in the relevant market. 'If the defendant successfully rebuts the presumption [of illegality], the burden of producing additional evidence of anti-competitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times.'

*Heinz,* 246 F.3d at 715 (citations omitted).[22] In sum, the Court must assess whether the FTC has established a prima facie case of a Section 7 violation, and if so, what if any impact the defendants' rebuttal evidence has on the FTC's case. *Id.*

■ To determine whether the FTC has met its burden of establishing a prima facie case that the proposed acquisition in this matter may violate the antitrust laws, this court must initially analyze the likely anti-competitive effects the merger would have. *Staples,* 970 F.Supp. at 1072. This analysis requires the Court to determine

**22.** The Court in *Heinz* concluded that this "analytical approach," which was developed in *United States v. Baker Hughes, Inc.,* 908 F.2d 981, 982–83 (D.C.Cir.1990), had proper application in deciding whether a merger should be enjoined, even though the approach was originally employed at the merits stage in *Baker Hughes.*

"(1) the 'line of commerce' or product market in which to assess the transaction, (2) the 'section of the country' or geographic market in which to assess the transaction, and (3) the transaction's probable effect on competition in the product and geographic markets." *Id.* at 1072–73 (citations omitted).

### 1. The Relevant Product Market

The first step in evaluating whether a merger violates Section 7 of the Clayton Act is to define the relevant product market. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). "The relevant product market is determined by examining the reasonable interchangeability of use between the product and substitutes for it." *FTC v. Warner Communications,* 742 F.2d 1156, 1163 (9th Cir.1984) (citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). The boundaries of the market may be determined by considering such factors as industry or public recognition of the market, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, and sensitivity to product changes and specialized vendors. *Id.* Here, at least as to whether the proposed merger should be enjoined, the parties agree that the relevant market in this case is food service glassware.[23]

### 2. The Geographic Market

The relevant geographic market is that geographic area "to which consumers can practically turn for alternative sources of the product and in which the antitrust defendant[s] face[ ] competition." *Staples,* 970 F.Supp. at 1073 (quoting *Morgenstern v. Wilson,* 29 F.3d 1291, 1296 (8th Cir. 1994), *cert. denied,* 513 U.S. 1150, 115 S.Ct. 1100, 130 L.Ed.2d 1068 (1995)). The parties agree that the relevant geographic market is limited to companies that supply glass tableware in the United States (Pl.'s Proposed Findings ¶ 59 at 228, Defs.' Am. Proposed Findings ¶ 154.)[24]

### 3. The Impact of the Amended Agreement on the Original Agreement

As indicated above, there are two merger agreements before the Court. One, the June 17, 2001 agreement and two, the January 21, 2002 agreement. The January 21st agreement was finalized one week after the FTC filed its complaint. Pursuant to this latter agreement, Libbey will only acquire Anchor's retail and specialty glassware business. Anchor's food service glassware business and assets will be transferred to Newell's subsidiary, RCP, who, according to defendants, will continue to compete in the food service glassware market.[25] The January 21st

**23.** During the oral argument that was held in this matter defense counsel for Libbey stated that defendants do not concede the relevant market, but for the purpose of addressing plaintiff's motion for preliminary injunction they would not contest the FTC's contention that the relevant market is food service glassware. (Transcript of Proceedings held on February 25, 2002 ("Tr.") at 88.)

**24.** The FTC states that "[t]he United States as a whole constitutes a relevant geographic market within the meaning of the anti-trust laws and a 'section of the county' within the

meaning of Section 7 of the Clayton Act." (Pl.'s Proposed Findings ¶ 59 at 228.) Libbey, through its expert witness, Dr. Pindyck, indicates that the relevant glass tableware market includes "all domestic and foreign companies who have the ability to sell glass tableware in the U.S." (Defs.' Proposed Findings ¶ 154 at 63.)

**25.** Defendants argue that plaintiff's challenge to Newell's internal transfer of its food service glassware business cannot support an injunction under the Section 7 of the Clayton Act because internal reorganizations are not re-

agreement specifies that it supercedes and nullifies the June 17, 2001 agreement:

> **Section 11.6 *Entire Agreement.*** This Agreement (including all schedules, exhibits, documents, and materials hereunder referred to, as amended) and the Ancillary Agreements constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supercede all prior agreements and undertakings, both written and oral, among the parties hereto with respect to the subject matter hereof.

(Pl.'s Ex. 719, Amended and Restated Stock Purchase Agreement by and among Newell Rubbermaid, et al. and Libbey Inc., dated January 21, 2002, at 118.)

The Court has not found, and neither party has identified, any precedent that has addressed how an amended merger agreement impacts the original agreement. Clearly, however, both are subject to Section 7's prohibitions.

The FTC's argument that defendants have in some manner sought to evade FTC and judicial review by proposing the amended agreement is without merit. Rather, the Court construes defendants' position to be that they have attempted to address the concerns expressed by the FTC by amending the proposed merger agreement.[26] The FTC remains capable of vetting the amended agreement, and in fact, in response to the Court's March 29th

Order, the Commission submitted a statement indicating that it had indeed voted to enjoin the amended merger agreement. Thus, the Court construes this statement as an indication that the Commission is challenging the amended agreement. Accordingly, the amended agreement is properly before the Court for judicial review on the FTC's motion for a preliminary injunction.

■ Despite the existence of the amended agreement and the defendants' statement that it "superede[s] all prior agreements," the FTC argues that the Court should evaluate the original agreement in deciding whether an injunction should be issued. On the other hand, defendants contend that the original agreement has been abandoned and that the government's motion for injunctive relief must be decided on the basis of whether the amended agreement raises sufficient anti-trust concerns. Operating on what appears to be a clear slate, the Court concludes that parties to a merger agreement that is being challenged by the government can abandon that agreement and propose a new one in an effort to address the government's concerns. And when they do so under circumstances as occurred in this case, it becomes the new agreement that the Court must evaluate in deciding whether an injunction should be issued.[27]

---

portable under the HSR Act. (Defs' Opp'n at 16.) Defendants' argument misses the point. Plaintiff does not merely challenge the internal transfer of Newell's food service glassware business. Rather, plaintiff challenges the acquisition by Libbey of portions of Anchor's business, which is reportable under the HSR Act, and alleges that the acquisition will have an anti-competitive effect that, in part, will occur as a result of Newell's internal transfer of its food service glassware business to RCP.

**26.** Part of the purpose of the mandatory notification procedures provided in 15 U.S.C. § 18a is to provide the federal antitrust enforcement agencies (the FTC and the Department of Justice) with advance notice of proposed mergers and acquisitions, so they can decide whether or not to challenge the transactions on antitrust grounds. (*See* Defs.' Ex. 167, FTC Introductory Guide I to the Premerger Notification Program, at 1.)

**27.** The Court is not unsympathetic to the FTC's argument that parties to an agreement might, in some cases, unscrupulously attempt

#### 4. The Effects of the Proposed Amended Acquisition on Competition in the Relevant Markets

█ The FTC has not presented a statistical analysis regarding the potential anti-competitive effects the proposed amended agreement might have on the market. However, in lieu of producing evidence of the amended agreement's effect on market power, the FTC has presented evidence that it contends shows that the revised merger agreement would result in RCP having to sell its food service glassware at higher prices, thereby demonstrating an actual detrimental effect to market.

█ There are several additional types of evidence the FTC may present to establish that the proposed transaction may violate the antitrust laws. For example, one factor that is "an important consideration when analyzing possible anti-competitive effects" is whether the acquisition "would result in the elimination of a particularly aggressive competitor in a highly concentrated market ..." *Staples,* 970 F.Supp. at 1083 (citation omitted). The FTC has presented substantial evidence that the proposed merger might effectively eliminate as a competitor in the food service glassware market what is now Anchor, who is one of Libbey's strongest competitors in a market that is already highly concentrated. The FTC's calculations demonstrate that the pre-merger HHI in the soda-lime glassware market in the United States is 5251. (Pl.'s Proposed Findings ¶ 211 at

66–7.) This figure therefore indicates a highly concentrated pre-merger market. *Staples,* 970 F.Supp. at 1082 ("any market with an HHI over 1800 qualifies as 'highly concentrated'") (quoting *FTC v. PPG Indus. Inc.,* 798 F.2d 1500, 1503 (D.C.Cir. 1986)).

The evidence also demonstrates that Anchor has provided effective competition against Libbey in this market as evidenced by the fact that Anchor has been able to secure the business of several former Libbey customers and had the goal of securing more of Libbey's business in the future before the original merger agreement was negotiated. Second, the evidence also shows that Anchor currently offers food service glassware at prices that are "frequently 10–20 [percent] below Libbey's [prices]." Third, Anchor is the largest seller of Libbey look-alikes, a feature that is essential to a company's ability to compete in this market. Finally, evidence presented by the FTC demonstrated that Anchor's glassware sales have grown annually over the last several years and, with the elimination of Libbey's PDP loyalty program, Anchor was poised to even more aggressively target Libbey customers.[28]

Further, the FTC's evidence supports a finding that, as a result of the amended agreement, what is now Anchor could effectively be eliminated from the food service glassware market. Although defendants contend that RCP would be able to step into Anchor's shoes, the amended

---

to avoid judicial and FTC review of an agreement by continuously amending it. However, based upon the facts of this case, the Court is not convinced that defendants were in fact purposely attempting to avoid judicial and FTC review of their agreement. Rather, they made a good-faith effort to address the FTC's concerns regarding the agreement, which it seems is consistent with the policies underlying Section 7.

**28.** In its March 2000 food service strategy plan, (Pl.'s Exh. 566), Anchor planned to "capitalize on [the] elimination of Libbey['s] PDP; aggressively pursue lost business.... [;o]ffer [a] complimentary program to Oneida (and ... [f]ind [a] partner to gain leverage against Libbey and Oneida ..."). (Pl's Ex. 566 at 000486.)

merger would result in the loss of the plants used by Anchor to manufacture food service glassware, and the possible outsourcing proposal submitted by the defendants would result in increased production costs of 4.3 percent. In fact, the cost to import the glassware and make it available for sale may be significantly higher. (*See* footnote 20, *supra.*) These facts tend to support a finding that RCP would not be in a position to provide effective competition against Libbey. In addition, Newell will lose key employees who were essential to Anchor's success in the food service industry, such as Anchor's Vice President of Operations, who was entrusted with the job of negotiating RCP's glass outsourcing supply agreements. (Pl.'s Supp. Findings ¶ 604 at 17.) [29] If that occurs, the already highly concentrated food service market would be condensed even further. In addition, it is highly likely that with RCP out of the picture, Libbey would garner at least some and possibly a significant share of what is currently Anchor's share of the market, thereby increasing its already overwhelming control of the food service glassware market. Moreover, if RCP has to market its glassware at a higher price, that could trigger an increase in price of other suppliers' glassware. All of these consequences, if they come to pass, would have a detrimental impact on the food service glassware market.

The FTC's evidence of the existence of significant barriers to market entry by other business entities also supports a finding that the amended agreement may violate the antitrust laws. *Heinz*, 246 F.3d at 718. The FTC presented convincing evidence that there are many barriers to entry into the food service glassware market. These barriers include the fact that

an effective competitor would need the ability to produce Libbey look-alike products, it would have to persuade distributers and other consumers, most of which have already established relationships with an existing food service glassware provider, to conduct business with it, and it would probably have to undercut the current competitors in the market by selling its glassware at lower prices in order to secure new business. For example, the FTC presented the declaration of Hilton Hotel's corporation purchasing agent of food and beverage non-consummables, Ron Lazar, who stated that "Hilton is hesitant to purchase soda-lime glassware from new, domestic, or foreign companies because of the uncertainty about how long they will be present in the market creating consistent designs for several years." (Pl.'s Ex. 11, Declaration of Ron Lazar dated October 1, 2001, ¶ 5.) It is therefore the Court's opinion that if RCP were unable to effectively replace Anchor as a viable competitor in the market, it is unlikely to be replaced by new entrants. If this occurs, the amended acquisition agreement would obviously have an anti-competitive impact on the market. *Cf. United States v. Baker Hughes, Inc.*, 908 F.2d 981, 987 (D.C.Cir. 1990) (defendant's "compelling evidence of ease of entry into [the relevant] market ... [was] sufficient to rebut the government's prima facie case").

 The FTC relies on *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) and *Toy's "R" Us, Inc., v. FTC*, 221 F.3d 928 (7th Cir.2000) as support for its proposition that it can show as a substitute for the presentation of a market share analysis to determine the amended agreement's potential effect on the market, the actual

---

**29.** This fact is intriguing as defendants argue that outsourcing was responsible for approximately $1.1 million of Anchor's 2001 sales, (Defs.' Am. Proposed Findings ¶ 65 at 24), and, as a result of the amended agreement, all of RCP's glassware would be outsourced.

detrimental effect the amended agreement could have on the market. (Pl.'s Supp. Findings ¶ 127 at 26.) The purpose of defining the market and determining market power is to evaluate whether a proposed merger "has the potential for genuine adverse effect on competition." *Indiana Fed'n,* 476 U.S. at 460, 106 S.Ct. 2009. " 'Proof of actual detrimental effects, such as a reduction of output,' can [therefore] obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.' " *Id.* at 460–61, 106 S.Ct. 2009 (quoting 7 P. Areeda, Antitrust Law § 1511, at 424 (1986)); *accord Toys "R" Us,* 221 F.3d at 937 (holding that there are two mays of proving market power "[o]ne, is through direct evidence of anti-competitive effects." And the other "more conventional way, is by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case") (citations omitted).

In *Indiana Fed'n,* the Supreme Court affirmed an FTC administrative law judge's ruling that the Federation of Dentist's policy of withholding x-rays from dental insurers constituted a violation of § 5 of the FTCA because the policy forced customers to choose between acquiring the information in a more costly manner or forgoing the information altogether. *Id.* at 458, 106 S.Ct. 2009. The Supreme Court held the dentists' actions were a restraint on competition because there was a finding of "actual, sustained adverse effects on competition in those areas where the [Federation's] dentists predominated." *Id.* at 461, 106 S.Ct. 2009. Similarly, in *Toys "R" Us, Inc.,* the Court of Appeal for the Seventh Circuit upheld a determination by the FTC that a boycott employed by Toys "R" Us, in which Toys "R" Us obtained agreements from toy manufacturers that prohibited the manufacturers from selling the same items to Toys "R" Us and to warehouse clubs such as Costco, in order to maintain its advantage in the market, violated the antitrust laws. 221 F.3d at 931–32. The court upheld the FTC's finding that the boycott employed by Toys "R" Us had a direct anti-competitive effect on the market because "[i]t was remarkably successful in causing the 10 major toy manufacturers to reduce output of toys to the warehouse clubs, and that reduction output protected [Toys 'R' Us] from having to lower its prices to meet the clubs' price levels." *Id.* at 937.

*Indiana Fed'n* and *Toys "R" Us* are distinguishable from the present case because in those cases there had already been an administrative investigation by the FTC and the evidence supported a finding that there had been "actual, sustained adverse effects on competition." *Indiana Fed'n,* 476 U.S. at 461, 106 S.Ct. 2009; *Toys "R" Us,* 221 F.3d at 937 ("sufficient proof of actual anticompetitive effects" made "elaborate market analysis" unnecessary). However, in this case, the FTC has presented other material evidence that the proposed acquisition could substantially lessen competition in the food service glassware market.

The FTC's evidence tends to establish that under the amended agreement RCP will not be a viable competitor in the food service glassware market because RCP's cost to acquire its glassware will be at least 4.3 percent higher than Anchor's current costs. The FTC argues that this higher glassware acquisition cost may force RCP to either increase its prices or reduce the amount of glassware it can have available for distribution. The FTC contends that either of these two consequences could force RCP to withdraw as a competitor from the food service glassware market.

Although the FTC's evidence is not positive proof that these events will actually occur, it is not required by law to present such evidence. Rather, as the court stated in *Heinz*, "the FTC is not required to *establish* that the proposed merger would in fact violate [S]ection 7 of the Clayton Act." 246 F.3d at 714. Indeed, the "determination of a likelihood of success must be made under time pressure and on incomplete evidence. The risk of an erroneous assessment is therefore higher than it is after a full evidentiary hearing." *FTC v. Weyerhaeuser*, 665 F.2d 1072, 1083 (D.C.Cir.1981); *Baker Hughes, Inc.*, 908 F.2d at 991 (" 'By focusing on the future, [S]ection 7 gives a court the uncertain task of assessing probabilities' "). The Court is not convinced that the acquisition as presented will in fact violate the antitrust laws; however, the facts as presented to the Court makes the FTC's concerns plausible and therefore sufficient to establish its prima facie case that the acquisition may have an anti-competitive effect on the market. When considered cumulatively, the FTC's evidence supports its position that what is now Anchor would be eliminated from the market and that RCP may not be a viable substitute to replace it.

The Court can also determine whether the FTC has established that the amended agreement may substantially lessen competition by an "examin[ation of] the concentration statistics and [the] HHI's [Herfendahl–Hirschmann Indices] within the geographic markets." *Staples*, 970 F.Supp. at 1081.[30] Having concluded that the FTC has demonstrated that the effect of the amended agreement could result in the elimination of what is now Anchor as a competitor in the food service glassware market, the Court believes that the impact on the market that might occur as a result of the amended agreement may be substantially identical to the impact the original agreement would have had on the market. Although no statistics were presented regarding what effect the amended agreement might have on the market, the best evidence of its potential effect is the impact of the original agreement because the post-merger landscape could quite possibly be similar to the terrain that would have been created if Libbey had acquired all of Anchor's business, assuming, as the FTC argues, that RCP may prove to be an ineffective competitor.

### a. The Original Proposed Merger and its Impact on Market Power

"Market concentration, or the lack thereof is often measured by the Herfendahl–Hirschmann Index (HHI)." *Heinz*, 246 F.3d at 716. HHI figures that are "sufficiently large . . . establish the FTC's prima facie case that a merger is anti-competitive." *Id.* (citations omitted). However, "[t]he Supreme Court has cautioned that statistics reflecting market share and concentration, while of great significance, are not conclusive indicators of anti-competitive effects." *Id.* at 717 n. 12.

Libbey currently has a market share of approximately 72 percent in the food service glassware market. Anchor has the third largest share of the market with an approximate market share of seven percent. As previously stated, the premerger HHI in the soda-lime glassware

30. "The HHI is calculated by squaring the individual market shares of all the firms in the market and adding up the squares. The HHI takes into account the relative size and distribution of the firms in a market, increasing both as the number of firms in the market decreases and as the disparity in size among those firms increases." *Staples*, 970 F.Supp. at 1081 n. 12.

market in the United States of 5251 indicates a highly concentrated pre-merger market. *Staples,* 970 F.Supp. at 1082. The "original" proposed merger announced on June 17, 2001, would have resulted in an HHI increase of 1052, thus resulting in a post-merger HHI of 6241.[31] (Pl.'s Proposed Findings ¶ 211 at 66–7.) This is clear evidence that the original merger would have substantially lessened competition in the market. *See Staples,* 970 F.Supp. at 1081 ("an increase in the HHI [in] excess of 50 points in a post-merger highly concentrated market may raise significant competitive concerns"). Defendants do not dispute the FTC's characterization of the impact the original proposed merger would have on the food service glassware market. Instead, they argue that the FTC must make an affirmative showing that the amended proposed merger will substantially harm competition. (Defendants' Proposed Findings ("Defs.' Proposed Findings") at 12.) However, as already discussed above, the FTC's evidence, when considered cumulatively establishes that the amended agreement would potentially have the same anti-competitive effect as the original agreement. For these reasons, the Court concludes that the FTC has established a prima facie case that the amended agreement may substantially lessen competition in the food service glassware market or that it would constitute an unfair method of competition.

### 5. *Defendants' Rebuttal Evidence*

 The FTC's prima facie case, which creates a presumption of anti-competitive effects, shifts the burden to the defendants to produce evidence to rebut that presumption. *Staples,* 970 F.Supp. at 1083. To rebut a presumption of anti-competitive effect, the defendant "must show that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition." *Baker Hughes, Inc.,* 908 F.2d at 991. The FTC's prima facie case may be rebutted by submitting, for example, evidence that demonstrates "the absence of significant entry barriers in the relevant market ... [,by demonstrating] the misleading nature of the statistics underlying the government's *prima facie* case and [by exhibiting] the sophistication of ... consumers [in the relevant market]." *Id.* at 984.

The defendants raise several arguments, which they contend, rebut the FTC's argument that the proposed agreement may substantially lessen competition in the food service market. First, defendants argue that what is now Anchor will not be eliminated from the market, so therefore new entrants into the market are unnecessary to maintain the current market status. Defendants contend that the FTC's argument that RCP may not be a viable competitor is mere speculation and can not support the issuance of an injunction. Defendants point out that under the amended agreement, RCP would retain Anchor's food service glassware business and therefore the agreement will not eliminate what is now Anchor as a competitor. In addition, defendants argue that outsourcing is very common and in fact, may be cheaper than Anchor's current costs.[32] Second, in response to the FTC's argument that the

---

31. According to the FTC, even using the figures of defendants' expert witness, Professor Pindyck, the original proposed merger would have resulted in a post-merger HHI of 3329, with an HHI increase of 589. (Pl.'s Proposed Findings ¶ 225 at 71.)

32. Specifically, defendants argue that "foreign-sourced glassware is typically less expensive than its domestic counterparts, despite transportation costs and tariffs, because labor cost[s] are far lower than in most other countries." (Defs.' Am. Proposed Findings ¶ 77 at 28.)

amended agreement is a sham because purportedly RCP does not actually intend to participate as a supplier in the food service market, defendants argue that Newell has made a "substantial investment" in maintaining Anchor's current food service business, including retaining a year's worth of food service supply, and has made representations to its stock holders and customers that it will indeed remain in the food service glassware business.

Third, regarding the market share statistics submitted by the FTC, defendants argue the statistics put forth by the FTC relate only to the original agreement, which has been abandoned. Therefore, according to the defendants, the FTC's statistics are "entirely academic." (Def.'s Opp. at 16–17.) Additionally, defendants contend that should the amended agreement be consummated, there would be *"no* increase in market concentration, *no* presumption of anticompetitive effects, and therefore *no* likelihood [that the FTC will achieve] . . . success on the merits." (*Id.* at 17.)

Finally, the defendants also attempt to rebut the FTC's prima facie case by arguing that any anti-competitive impact of the amended agreement will be offset by the efficiencies [33] that will be lost if the acquisition is enjoined. Specifically, defendants argue that Libbey would lose the efficiencies it needs to compete effectively against foreign manufacturers, in both the food service and retail markets, efficiencies that Libbey estimates would be worth more than $18 million per year. (Defs.' Opp'n at 39.) Defendants also argue that by issuing the preliminary injunction the public

"will lose the pro-competitive benefits" of the efficiencies that the defendants will receive if this merger is consummated. In support of this, Libbey quotes several of its retail and industrial customers who assert that there will be pro-competitive benefits as a result of the acquisition, "including lower prices and improved product development." (Defs.' Opp'n at 39–40.) Defendants also note that the union that represents Libbey's and Anchor's factory workers believe the acquisition will make Libbey a more efficient competitor.

The Court concludes that the rebuttal evidence offered by defendants fails to rebut the FTC's prima facie case that the proposed acquisition may substantially lessen competition in the food service glassware market. First, and primary among the Court's concerns, is the fact that RCP will, based on the evidence submitted to the Court, have a 4.3 percent higher cost than Anchor's current cost to acquire its food service glassware, and thus may not be able to effectively compete against Libbey. Indeed, the Vice President/ General Manager of Anchor Hocking Canada testified during his deposition that one of Anchor's advantages has been the fact that it is "a lower cost manufacturer, so we can go to [the] market with a slightly lower price. That's what we believed all along." (Pl.'s Ex. 631, Deposition of Umberto P. Filice dated September 28, 2001 at 44:2–4.) Although RCP will purportedly have a year's worth of inventory, this fact does not alone establish that it will remain a viable competitor in the food service glassware market over the long haul. If indeed RCP proves not to be a viable competitor, there is the possibility that consumers would be harmed in the

---

**33.** A primary benefit to the economy is a merger's potential to generate efficiencies. *Heinz,* 246 F.3d at 720. Efficiencies " 'can enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, or new products." *Id.* (citing U.S. Dep't of Justice & Federal Trade Comm'n, Horizontal Merger Guidelines § 4 (1992), as revised (1997)).

form of paying higher prices for Libbey look-alike products. *See Heinz*, 246 F.3d at 719 ("the antitrust laws assume that a retailer faced with an increase in the cost of one of its inventory items 'will try so far as competition allows to pass that cost on to its customers in the form of a higher price for its product'") (citation omitted).

Second, is the distinct and realistic probability that Libbey would be able to increase the price of its glassware because Anchor, the leading seller of Libbey look-alikes, would be eliminated from the market. Libbey is already the price leader in the food service glassware market, with its glassware prices tending to be higher than those for similar products offered by other suppliers. In addition, the evidence shows that Libbey's prices are the highest in the glassware market that it dominates, which demonstrates that Libbey tends to maintain lower prices in markets where it faces more competition.

The evidence also demonstrates that if what is now Anchor were eliminated from the market, there are no other viable alternatives to Libbey's food service glassware that consumers could reply upon to acquire their glassware at the lower prices now offered by Anchor. Consumers are not likely to turn to Oneida, Arc or other food service glassware suppliers in significant numbers due to the cost involved in replacing their entire existing inventory of Libbey or Libbey look-alike food service glassware. (Pl.'s Proposed Findings at ¶¶ 308–312, at 101–102.) Although Oneida supplies Libbey look-alikes, its numbers are small. And since the majority of food service glassware consumers have Libbey and Libbey look-alike inventories, Anchor's current customers will most likely have no alternative other than Libbey if Anchor is no longer in business and RCP's efforts prove unsuccessful. Moreover, neither lead crystal nor plastics would be a viable alternative for consumers because of the high cost associated with lead crystal and the poor durability of plastics.

Although the evidence presented by the defendants demonstrates that there could potentially be some positive results of the acquisition, the Court does not believe that these results outweigh the potential harm to the market that could result given the fact that there has not been sufficient evidence to establish how RCP will be able to compete effectively given the higher costs it will have to pay for its glassware, and why Libbey will not use this opportunity to raise its own prices. *See, e.g., Heinz*, 246 F.3d at 720 ("the high market concentration levels present in this case require, in rebuttal, proof of extraordinary efficiencies, which the appellees failed to supply") (citation omitted). The Court therefore concludes that the effects of the amended merger may substantially lessen competition in the food service glassware market and that defendants' rebuttal evidence is not sufficient to overcome the FTC's prima facie showing.

### B. *Balancing of the Equities*

Having determined that the FTC has demonstrated that it will likely succeed on the merits, the court must now determine whether granting an injunction "would be in the public interest ... as determined by a weighing of the equities." *Heinz*, 246 F.3d at 714. This evaluation must be made with the appreciation that the FTC's demonstration of a likelihood of success on the merits "creates a presumption in favor of preliminary injunctive relief." *Heinz*, 246 F.3d at 726. An analysis of the equities "properly includes the potential benefits, both public and private, that may be lost by a merger blocking preliminary injunction." *Id.* (quoting *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1082 (D.C.Cir.1981)). Once the FTC has established its likelihood of success, as it has

done here, the Court must not "respond[ ] automatically to the [FTC's] threshold showings." *Weyerhaeuser*, 665 F.2d 1072, 1082. Instead, the Court must exercise its "independent judgment" and "take genuine account of 'the equities.'" *Id.* However, when the FTC has demonstrated a likelihood of success, "a countershowing of private equities alone [will] not suffice to justify denial of a preliminary injunction barring the merger." *Id.* at 1083.

■ The principle equity that must be weighed when deciding whether a preliminary injunction should issue "is the public interest in effective enforcement of the antitrust laws." *Heinz*, 246 F.3d at 726. This is because the potential harm that could occur to the public, for example, an increase in prices, can not be recovered at the conclusion of an administrative proceeding at which the government prevails. *Staples*, 970 F.Supp. at 1091. Although the Court is not of the belief that Newell is acting in bad faith in asserting that RCP will continue to compete in the food service market, as the Court has noted before, defendants have failed to provide sufficient proof that RCP can and will, despite its good intentions, be an effective competitor in the food service glassware market.

Preserving the status quo so that meaningful relief will be available to the FTC, is another equity that weighs in favor of issuing the preliminary injunction. *Staples*, 970 F.Supp. at 1091. " 'Unscrambling the eggs' after the fact may not be a realistic option in this case." *Staples*, 970 F.Supp. at 1091. If the proposed acquisition is consummated, Libbey would acquire Anchor's two manufacturing plants that it uses to make food service glassware, the

Anchor brand name, and certain other Anchor assets, such as key employees, some product molds that are used in both the retail and glassware markets, and customer relationships. Defendants argue that there are no post-merger plans to close Anchor's manufacturing facilities or to transfer Anchor's current distributors to Libbey, so that RCP will sell to the Anchor distributors, who are "in many cases the same distributors as Libbey uses." (Defs.' Opp'n at 41.) The Court is not persuaded by these arguments. The FTC presented evidence that Libbey closed a Canadian plant it acquired within five years of its acquisition and that Libbey has recently announced plans to reduce production at its own plants. (Pl.'s Reply at 24.) [34] In addition, defendants do not address the fact that · Anchor's key employees, who have experience competing against Libbey in the food service market, will become Libbey employees who, if the FTC ultimately prevails, would then have to return to Anchor and redirect their loyalties again to compete against Libbey. Such shifting of personnel between competitors should be avoided to ensure that the competition that currently exists is not diluted.

Regarding the private equities, defendants have argued that if this Court issues a preliminary injunction the acquisition will effectively die. Although the Court is cognizant of the hurdles this injunction may pose to the defendants, "[i]f the [acquisition]·makes economic sense now, the [defendants] have offered no reason why it would not do so later." *Heinz*, 246 F.3d at 727. In light of the potential harm to consumers and the possible inability to provide meaningful and complete relief to the FTC if it is ultimately successful after

---

34. Defendants argue that FTC's statement regarding the Canadian plant is "disingenuous" because the Canadian plant was "outdated" and inefficient and is not comparable to the plants it plans to acquire under the amended agreement. (Defs.' Am. Findings ¶ 53 at 18–

19.) However, while the FTC's evidence does not establish that Libbey will in fact close the plants it would acquire from Newell, it tends to demonstrate, along with the other evidence presented, that such an event could occur.

the proposed acquisition is consummated, the weighing of the equities in this matter tips the scales in favor of the FTC.

### III. *CONCLUSION*

As already stated, despite the Court's decision to issue the preliminary injunction, it is not convinced that the defendants' attempts to salvage the original merger proposal was done in bad faith, as suggested by the FTC. Rather, the Court is principally concerned that the increase in production costs that RCP will incur should the merger be consummated would, in the end, potentially have the same anti-competitive effect that the initial merger agreement would have had on the market. This factor, in conjunction with the other factors discussed above, leads the Court to the conclusion that the acquisition should not be completed until the FTC has concluded its investigation in the matter.

For these reasons, the Court hereby GRANTS the plaintiff's motion for a preliminary injunction.[35]

---

**35.** An Order consistent with this opinion is being issued contemporaneously with the issuance of this Opinion.